**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **BONNIE ESTEP**[1], ) | **CASE NO. 5:10CV2829** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MAGISTRATE JUDGE GREG WHITE** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Bonnie Estep ("Estep ") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I. Procedural History

On July 27, 2006, Estep filed an application for DIB, POD, and SSI alleging a disability onset date of January 1, 2004, and claiming that she was disabled due to "disorders of back, discogenic & degenerative," and "affective disorders." (Tr. 64.) Her application was denied both initially and upon reconsideration. Estep timely requested an administrative hearing.

On May 6, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Estep, represented by counsel, testified. Nancy J. Borgeson, an impartial Vocational Expert ("VE") also testified. On June 3, 2009, the ALJ found Estep was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision

---

[1] The record reflects that Bonnie Estep was also known as Bonnie Mills.

became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age 44 at the time of her administrative hearing, Estep is a "younger" person under social security regulations. (Tr. 16.) *See* 20 C.F.R. §§ 404.1563 & 416.963. She has a high school education and past relevant work as a housekeeper. (Tr. 16.)

### *Medical Evidence*

In 1998, Estep sought treatment from Eugene Pogorelec, D.O. (Tr. 268-269.) In February, 2004, Estep complained of back and knee pain to Dr. Pogorelec.[2] (Tr. 243.) On June 12, 2004, Estep visited a hospital for back pain and was prescribed Vicodin. (Tr. 241.) Two days later, Estep saw Dr. Pogorelec claiming that she was still experiencing pain. *Id.* He referred her for a nerve conduction study, which revealed left ulnar neuropathy and "right C6, 7 radiculopathy." (Tr. 213.) An October 22, 2004 cervical spine magnetic resonance imaging ("MRI") revealed mild disc bulges, but "no canal stenosis or obvious nerve root encroachment." (Tr. 225.) A thoracic spine MRI conducted the same day revealed minimal disc bulge at T8-T9. (Tr. 226.)

On January 11, 2005, Paul T. Scheatzle, D.O., examined Estep for neck and back pain. (Tr. 636-639.) He diagnosed "cervicothoracic degenerative disc disease now with myofascial pain and somatic dysfunction of the cervicothoracic spine, lumbosacral spine, and trapezius." (Tr. 638.) Neurontin was prescribed. *Id*. Dr. Scheatzle recommended a career change as he felt it would be a recurring problem "as long as she continue[d] to do her repetitive physically demanding work." *Id.*

On March 10, 2005, Estep complained of headache and back pain to Dr. Scheatzle. (Tr. 624.) Osteopathic manipulative treatment ("OMT") was performed. *Id.* He diagnosed myofascial pain syndrome and somatic dysfunction of the cervicothoracic spine and trapezius.

---

[2]The record reflects that Estep frequently visited these doctors for back, hip, and knee pain up until the alleged onset date of her disability, January 1, 2004. (Tr. 244-269.)

*Id.*

On March 17, 2005, Dr. Scheatzle examined Estep. (Tr. 622.) She complained of chest and back pain and increased anxiety. *Id.* OMT was again performed. *Id.* Dr. Scheatzle diagnosed cervicothoracic lumbar sprain with somatic dysfunction and cervicogenic chest pain. *Id.* He prescribed Atvian for anxiety and increased pain and recommended that she postpone physical therapy for a week. *Id.* He also supported Estep in making a career change. *Id.*

In August, 2005, Estep began treating with Son Dang, M.D., who was in the same practice as Dr. Pogorelec.[3] (Tr. 331.) Dr. Dang referred her to pain management. *Id.*

In February, 2006, Michael Rivera, M.D., and Director of the Pain Center of Doctors Hospital, examined Estep for complaints of chronic pain. (Tr. 315-317.) He reported spasms, trigger points and tenderness throughout the cervical and upper thoracic areas. (Tr. 311, 313.) He diagnosed fibromyalgia, lumbar degenerative disc disease, history of migraines, and history of anxiety. (Tr. 316.) He recommended trigger point injections and then physical therapy. (Tr. 317.) In March, 2006, Estep underwent injections, which she reported helped her symptoms. (Tr. 313.) At a June, 2006 appointment, Estep complained of increased pain and Dr. Rivera performed a cervical epidural injection. (Tr. 309-311.) In October, 2006, she was discharged from the pain center after threatening litigation against the clinic. (Tr. 319, 391, 536.)

On October 20, 2006, Estep visited Mercy Medical Center Emergency Department with back pain. (Tr. 390-392.) She was diagnosed with acute exacerbation of chronic back pain and instructed to follow-up at the ambulatory care clinic. (Tr. 392.) Vicodin was prescribed. *Id.* Estep treated at Mercy Medical in the outpatient orthopedic department with Ajay Nooka, M.D., and Ronald Crock, M.D., on December 21, 2006. (Tr. 536-538.) The doctors assessed chronic low back pain, migraines, depression, peripheral neuropathy and emphysema. (Tr. 537.) Estep was referred to pain management and physical therapy. *Id.* She participated in physical therapy from December, 2006, through February, 2007. (Tr. 375-389; 579-590.)

---

[3]Dr. Dang's signature is illegible, but counsel's cover page (Tr. 318) indicates that the transcript from pages 319 through 331 are Dr. Dang's office notes.

3

An MRI of Estep's lumbar spine was conducted on August 17, 2007, revealing "mild degenerative spondylosis lower lumbar spine at L4-5 and L5-S1. Negative for disk herniation or significant central or foraminal stenosis." (Tr. 430.)

A bone density scan was performed on November 19, 2007, resulting in a diagnosis of osteopenia. (Tr. 428-429.)

Estep visited Mercy Medical again in December, 2007, complaining of chest pain and coughing. (Tr. 426.) Diagnosis was bronchitis, atypical chest pain, and exacerbation of COPD. *Id.*

On October 9, 2008, Estep visited Xiaoyan Chen, M.D., at Mercy Medical to establish a new primary care relationship. (Tr. 480-481.) She complained of right arm and shoulder pain resulting from a car accident three weeks earlier. (Tr. 480.) An elbow x-ray was normal. (Tr. 489.)

At an examination with Dr. Chen on February 12, 2009, Estep complained of chronic head, shoulder, arm, and leg pain that worsend with movement. (Tr. 479.) Dr. Chen assessed chronic pain and depression. *Id.* She noted that Estep's pain was associated with her depression. *Id.*

On April 15, 2009, Estep visited Mercy Medical emergency room with complaints of chest, shoulder, back, and leg pain over the past month. (Tr. 641.) She was diagnosed with shoulder, chest, and upper back strain, chronic obstructive pulmonary disease ("COPD"), and possible fibromyalgia. (Tr. 642.)

On April 30, 2009, Dr. Chen and Meena Waidande Rajan, M.D., completed a pain questionnaire indicating that Estep suffers from physical/mental impairments that are capable of producing pain, including migraine headaches, osteopenia, degenerative spinal disease, and anxiety. (Tr. 632.) Estep's subjective complaints included chronic back pain and shoulder/arm pain. *Id.* A bone scan confirmed Estep's osteopenia. *Id.* The doctors noted that her pain impaired her working performance and further noted that her depression "may contribute a psychological component to her pain." *Id.* They felt that Estep was truthful regarding her perception of pain. *Id.*

4

From November, 2008, through March, 2009, Estep was treated for depression at Trillium Family Solutions. (Tr. 541-560; 659-661.) She was diagnosed with major depression, recurrent, moderate and borderline traits. (Tr. 546.) Cymbalta and Trazodone were prescribed. (Tr. 547.) In 2009, she reported that she had no problems with the medications. (Tr. 540.)

*Consultative and Reviewing Examinations*

On January 2, 2007, James Lyall, Ph.D., ABPN, performed a psychological evaluation, assessing adjustment disorder with mixed emotional features. (Tr. 337-340.) Dr. Lyall opined that Estep's mental functioning abilities, including the ability to maintain attention and follow instructions, were all only mildly impaired. (Tr. 339.)

On January 8, 2007, Irma Johnston, Psy.D., a state reviewing psychiatrist, completed a psychiatric review. (Tr. 342-355.) She concluded that Estep's mental impairments and limitations were not severe. (Tr. 354.) Todd Finnerty, Psy.D., affirmed Dr. Johnston's opinion in March, 2007. (Tr. 415.)

Paul Morton, M.D., a state agency reviewing doctor, completed a physical capacity assessment in February, 2007. Dr. Morton indicated that Estep could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, or sit for six of eight hours a day; was limited in her ability to push or pull in her upper extremities; and, had particular postural and manipulative restrictions. (Tr. 365-368.) Elizabeth Das, M.D., affirmed Dr. Morton's opinion in April, 2007. (Tr. 416-417.)

*Hearing Testimony*

At the hearing, Estep testified to the following:

- She lives with her husband and twenty-one year old daughter. (Tr. 25.)

- She plays video games, but not for long because her hands go numb. (Tr. 26.) She spends two or three hours watching television, but cannot sit for long because of pain and numbness in her back. (Tr. 27.) She also takes care of and plays with her cat. (Tr. 26.)

- She only leaves her home to go to the grocery store and to her father's house to see her grandchildren. (Tr. 28.) Her daughter drives her to these places. *Id*.

- At the grocery store, she can walk for only about twenty minutes, and then her daughter finishes the shopping. (Tr. 30.) She is embarrassed to use the wheelchair carts. *Id.*

5

- The heaviest thing she lifts is her cat, which is not very big. *Id.*

- Her daughter does the household chores, although Estep does some light dusting. (Tr. 29.) She puts laundry in the washing machine, but is unable to unload it because her shoulders hurt. *Id.*

- She stopped working at the nursing home on January 6, 2004, when her doctor told her she could no longer work. (Tr. 31.) Her employer refused to give her light duty, and then terminated her because she could not do the waxing and buffing of the floors, move twenty-one tables by herself or do laundry *Id.*

- Her entire back hurts when she breathes, and her neck hurts all the time. (Tr. 35.) The pain is every day, all day long. *Id.*

- She cuts herself because she feels worthless and is depressed. (Tr. 35, 42.) She prays to God every night that she would just die. (Tr. 35.)

- She has been depressed since 2004, but her depression got worse in 2007 when her house burned down four days before Christmas. (Tr. 41.)

- She sees a counselor at Trillium once a week for depression. (Tr. 42, 44.)

- She thinks her doctors believe she is lying. (Tr. 43.) She has no insurance and got on the free drug program to pay for her medication. *Id.*

After the VE described Estep's past relevant work as housekeeping in a medical facility (light and unskilled, as performed by Estep), the ALJ posed the following hypothetical to the VE:

> Now, I'd like you to assume a hypothetical individual with the same age, education and work experience as the claimant. I'd like you to further assume that this individual is able to lift and/or carry 20 pounds occasionally, 10 pounds frequently. Stand and/or walk for six hours of an eight-hour day. Sit for about six hours. Is limited to occasional pushing and pulling with upper extremities. Occasional climbing of ramps and stairs. No ladders, ropes or scaffolds. Occasional balancing, stooping, kneeling, crouching, and crawling. Frequent handling, fingering and feeling. Person needs to avoid concentrated exposure to smoke, fumes, dust, gas. This person is able to understand, remember and carry out non-detailed, three or four-step instructions. And is limited to occasional interaction with coworkers and the general public.

(Tr. 51, 52.) The VE testified that such a person could not perform the past relevant work, but that such a person could be a gasket inspector at the light, unskilled level (3,700 jobs in northeast Ohio, 17,000 in the state, 300,000 nationally); mail clerk, classified as light at the specific vocational preparation ("SVP") 2 level (1,450 jobs in northeast Ohio, 7,200 in the state, 167,000 nationally); assembler of small parts, classified as light an unskilled at the SVP 2 level (5,000

jobs in northeast Ohio, 48,000 in the state, and 752,000 nationally).[4] (Tr. 52-53.)

Estep's attorney asked the VE to consider if the individual required a sit/stand option and had to shift positions every thirty minutes. (Tr. 53.) The VE indicated that such an individual could perform the mail clerk job, but not the inspection or assembler jobs.

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

---

[4] The Dictionary of Occupational Titles ("DOT"), *see* http://www.oalj.dol.gov/libdot.htm, Appendix C, defines SVP as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." It further defines level "2" as "anything beyond short demonstration up and including 1 month." DOT, 4th Ed.,1991 WL 688702 (1991).

The DOT was originally created by the Employment and Training Administration, and was last updated in 1991. It has largely been replaced by the O*Net but continues to be used as a reference source in Social Security cases.

[5] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Estep was insured on her alleged disability onset date, January 1, 2004, and remained insured through the date of the ALJ's decision, June 3, 2009. (Tr. 9.) Therefore, in order to be entitled to POD and DIB, Estep must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Estep established medically determinable, severe impairments, due to depressive disorder, carpal tunnel syndrome, fibromyalgia, degenerative disc disease, and asthma; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Estep was found incapable of performing her past work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Estep is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.*

*Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Estep claims the ALJ erred by (1) failing to follow the treating physician rule; (2) failing to properly consider Estep's pain complaints, particularly with regard to her fibromyalgia; (3) failing to include her mental impairments in formulating the residual functional capacity ("RFC"); and, (4) relying on flawed VE testimony.

### *Treating Physician Rule*

Estep contends that the ALJ assigned her treating physicians' and physical therapist's opinions no weight, but gave greater weight to the opinions of the state agency reviewing physicians and an examining psychological consultant. (Doc. No. 19 at 11-14.)

Under Social Security regulations, the opinion of a treating physician is entitled to

9

controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). Those good reasons must be "supported by the evidence in the case

---

[6] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996).  This requirement is not simply a formality; it is to safeguard the claimant's procedural rights.  It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that []he is not."  *Wilson*, 378 F.3d at 544.  Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule."  *Id*. at 544-45.  *See Cole v. Astrue*, 2011 U.S. App. LEXIS 19392, 11-12 (6th Cir. 2011)

According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

ALJs also must consider the opinions offered by state agency medical specialists, as these are highly qualified physicians and are experts in Social Security disability evaluation.  20 C.F.R. §§ 404.1527(f)(2)(i); 416.927(f)(2)(i).

Here, there was only a single opinion, the pain questionnaire, offered by Dr. Chen and Dr. Rajan, Estep's treating internists, regarding her work limitations.  Addressing that opinion, the ALJ concluded:

> Physicians were of the opinion that the claimant's impairments impair her working performance.  However, the only objective finding they cited in support of this conclusion was the claimant's bone density scan findings, which does not appear to be a severe impairment (Exhibit 27.)  As this opinion is not reliable, it is given less weight.

(Tr. 16.)  Estep contends that the ALJ ignored a portion of Drs. Chen and Rajan's opinion that

11

Estep's work activities are impaired due to pain and depression. (Doc. No. 19 at 11-12, Tr. 632.) She also contends that the ALJ ignored the regulations by not addressing the required factors. *Id.* Estep has not demonstrated how these factors help, except that the doctors had treated her for over two years. She has not shown how further consideration of the treatment history would have changed the ALJ's analysis. *See Shineski v. Saunders*, 556 U.S. 396, 129 S.Ct. 1696, 1706 (2009) (party seeking to overturn agency's decision bears the burden of showing that a lapse in articulation or error was harmful); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) (same).

Next, Estep argues that the ALJ failed to address the evidence from her physical therapist whose notes indicated that her sitting/standing/walking tolerances were impacted by pain; and, that therapy did not help. (Doc. No. 19 at 12-13.) The regulations define medical opinions as assertions involving judgments about a patient's "symptoms, diagnosis and prognosis." Although the physical therapist noted that Estep is limited in functional tolerances, it was not an opinion as to prognosis or Estep's work abilities to be weighed by the ALJ.[7] The ALJ, therefore, did not err by failing to give weight to this non-opinion.

Estep also asserts that the ALJ improperly gave greater weight to the non-treating physicians' opinions who relied upon out-dated medical evidence. (Doc. No. 19 at 12-14.) The ALJ gave greater weight to the non-treating doctors, as follows:

> As for the opinion evidence, the State Agency medical consultant opinion at Exhibit 12F is given greater weight. The consultants were of the opinion that the claimant could perform a range of light work, with occasional and frequent limitations on postural functions and no more than frequent handling, fingering, and feeling. The consultants had benefit of review of the evidence of record at that time.
>
> * * *
>
> Greater weight is also given to the opinion of the consultative examiner at Exhibit 6F, which noted that the claimant had no more than mild limitations in various areas of mental functioning. While greater limitation was found based in part on some benefit of doubt given to the claimant, this opinion is given greater credit as generally underscoring the conclusion that the claimant's impairments are not disabling. The examiner had benefit of examination of the claimant.

---

[7]The ALJ acknowledged the fact that Estep did not respond to physical therapy and was discharged. (Tr. 14.)

12

(Tr. 15-16.) Estep argues that after the non-treating physicians offered their opinions, there were an additional 231 pages of new treatment notes (Doc. No. 19 at 12; Tr. 418-748), but she fails to explain how the evidence changed. For instance, Estep had an MRI in August 2007 showing only mild degenerative spondylosis and no herniation or stenosis. (Tr. 430.) Testing for chest pain was normal in December, 2007. (Tr. 423-427.) In 2009, Estep acknowledged that anti-depressant medication helped her symptoms. (Tr. 546.) Moreover, she received counseling at Trillium for her mental impairments only four times through March, 2009. (Tr. 540-560.) Lastly, other than an emergency room physician who noted "possible" fibromyalgia on April 15, 2009,[8] she has not been diagnosed or treated for fibromyalgia since her relationship with Dr. Rivera was terminated in October, 2006. (Tr. 642.) Moreover, the ALJ, giving Estep the benefit of the doubt, limited her functional capacity more than the reviewing and consultative doctors found she was capable of performing. (Tr. 13, 15, 16.) As the record does not support still greater limitations, her argument is without merit.

### *Credibility/Pain Complaints – Fibromyalgia*

Estep next asserts that the ALJ failed to properly consider her pain complaints, particularly with regard to fibromyalgia. (Doc. No. 19 at 14-17.) The Commissioner countered that the ALJ reasonably determined Estep's fibromyalgia and other impairments were not disabling. (Doc. No. 22 at 14-16.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.

---

[8]The record reflects that on August 31, 2009, after the administrative hearing, Estep was diagnosed with fibromyalgia. (Tr. 650-653.) This evidence cannot be considered by the Court as it was obtained after the hearing date. *See Leigh v. Comm'r of Soc. Sec*., 2011 WL 2746219, *1 (E.D. Mich. Jun. 21, 2011) (Since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.)

13

Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

If the claimed pain is not substantiated by the medical record, the ALJ must make a credibility determination based on the entire case record. *Id*. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross* v. Comm'r of Soc. Sec., 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

Regarding fibromyalgia cases, in contrast to most other medical impairments, it is difficult to find corroborative medical evidence.

> Fibromyalgia, also referred to as fibrositis, is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005). We note also that ours is not the only circuit to recognize the medical diagnosis of fibromyalgia as well as the difficulties associated with this diagnosis and the treatment for this condition. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that fibromyalgia's "causes are unknown, there is no cure, and,

14

> of greatest importance to disability law, its symptoms are entirely subjective"); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2nd Cir. 2003) (noting that "a growing number of courts . . . have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease") (internal quotation marks and citations omitted); *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) ("'Because proving the disease is difficult . . ., fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'") (*quoting Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3. (6th Cir. 2007); *see also Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 915 (3rd Cir. 2003).

The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. "The mere diagnosis of fibromyalgia is insufficient to render a claimants complaints of disabling pain credible." *Vlaiku v. Astrue*, 2008 U.S. Dist. LEXIS 64442 (N.D. Ohio Aug. 4, 2008) (*citing Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967); *Brazier v. Sec'y of Health & Human Servs.*, 61 F.3d 903 (6th Cir. 1995)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007).

Though there is a medical opinion confirming Estep's diagnosis of fibromyalgia, as acknowledged by the ALJ by finding it to be a severe impairment, Estep must also show that the condition is of such a severity as to be disabling. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (*citing Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether the claimant is one of the minority."). Here, no doctor reported that Estep's fibromyalgia limited her work abilities. *See Bartyzel v. Comm'r of Soc. Sec.*, 2001 WL 1681118, *8 (S.D. Ohio Sept. 28, 2001) ("Although the record reflects a diagnosis of fibromyalgia, the mere diagnosis of a condition is not tantamount to an opinion of disability.")

Even though there was no medical opinion limiting Estep's work abilities based upon

15

fibromyalgia, the ALJ was aware of his responsibility to conduct a credibility analysis based upon pain. (Tr. 13-15.) He found that Estep's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of her symptoms were not credible. *Id.* After thoroughly analyzing the medical record, the ALJ concluded as follows:

> In addition, the claimant has acknowledged the performance of certain activities that indicate that she has not been as limited as she asserted. The claimant has reported that she has performed various household chores after the alleged onset date (see Exhibits 6E &6F). She even reported doing 160 crunches with a 25-pound weight on her abdomen, an activity that would be difficult to perform with her reported level of pain severity (Exhibit 22F/56). The claimant also testified that she refused to go to the crisis center, which could suggest that her symptoms are not as severe. In addition, the claimant reported in 2005 that she had recently been working at a lighter level duty job. In October 2005, she reported doing intermittent housework on the job without doing the heavier floor buffing work. Also, it is noted that the claimant reported being able to stand for two hours while shopping and sit for one hour (Exhibit 13F/3). This report suggests greater functioning than as reported during the hearing. Furthermore, the claimant was able to work for several years with pain; she had reported that she has experienced pain for eight years, which overlapped with the time that she worked as a housekeeper buffing floors. Based on the minimal objective findings, it follows that the claimant's back problems may have not become so severe that she could not perform even light work. Also, the claimant reported that she enjoys reading and playing video gams, which requires greater use of the hands as well as concentration.
>
> While the claimant testified that she reads the classified section of the paper for job openings, she only applied for one job as a cashier position at Target. The fact that she applied also suggests that she believes she is capable of greater functioning (especially standing and lifting objects at a cash register, akin to light work).

(Tr. 15.) The ALJ reasonably considered Estep's wide array of activities of daily living to find they were inconsistent with her pain complaints.

### *Mental Impairments*

Estep next contends that the ALJ failed to include the moderate limitations he found in his step two analysis when he later formulated the RFC. (Doc. No. 19 at 17-18.) Specifically, Estep contends that the ALJ found moderate limitations with regard to concentration, persistence, and pace (Tr. 12), but then calculated her RFC without these limitations. (Doc. No. 19 at 17-18.).

Regarding concentration, persistence and pace, the ALJ concluded at step two as follows:

16

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. The consultative examiner expressed the opinion that the claimant had mild limitation in this area (Exhibit 6F). The claimant reported she has no trouble following directions ( Exhibit 6E). She complete [sic] a number of activities as described above, which require at least some ability to maintain concentration, persistence, and pace. Therefore, there is no more than moderate limitation.

(Tr. 12.) Later, in calculating the RFC, the ALJ noted that Estep enjoys reading and playing video games, both requiring concentration. (Tr. 15.) Also, in the ALJ's step four analysis, he gave great weight to the consultative examiner who indicated that Estep had no more than mild limitations in various areas of mental functioning. (Tr. 16.)

Estep argues that *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010) is instructive in this case. The *Ealy* Court held that "[b]ecause the controlling hypothetical inadequately described Ealy's limitations, the expert's conclusion that Ealy could work as an assembler, inspector, packer, or production worker does not serve as substantial evidence." *Id*. at 517. In *Ealy*, however, the ALJ relied on a state examining physician's opinion who noted that the claimant had moderate limitations in his ability to maintain attention and concentration for extended periods of time. *Id*. at 517, fn. 4. Here, there was no physician's opinion that Estep had moderate limitations. The consultative examiner opined that her mental functioning abilities were only mildly impaired. (Tr. 338.) The state examining psychiatrist found that Estep had no severe mental impairments. The ALJ properly relied on Estep's mental impairments as represented by the state examining doctors.

### *Vocational Expert's Testimony*

Finally, Estep argues that the ALJ relied upon VE testimony that was inconsistent with the DOT. (Doc. No. 19 at 18-20.) Specifically, Estep asserts that the VE relied upon a "Skilltran" brochure, which is outside the DOT governing material, and that the "reasoning level" of the jobs the VE identified as within Estep's capability was inconsistent with the hypothetical. *Id*.

The ALJ has discretion to determine whether to rely on a VE's testimony. *Sias v. Sec'y of H.H.S.*, 861 F.2d 475, 480 (6th Cir. 1988.) To establish that work exists in the national economy, the ALJ may rely on evidence, such as the testimony of a VE and the DOT. The ALJ

takes administrative notice of reliable job information available from various governmental publications such as the DOT, published by the Department of Labor.  20 C.F.R. § 404.1566(d). Neither the ALJ nor the VE, however, is required to follow the DOT.  *Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. App'x 163, 168 (6th Cir. 2009) (*citing Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003)) (holding that "the ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications").  S.S.R. 00-4p requires ALJs to ask the VE whether there was "any discrepancy between his opinions and the DOT standards for the requirements of the jobs named."  *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).  The ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by S.S.R. 00-4p.  *Id*.  Such obligation falls to claimant's counsel by cross-examining the VE and bringing out any conflicts with the DOT at the time of the hearing. *Beinlich*, 345 Fed. App'x at 168-169.  Lastly, the ALJ's determination is entitled to substantial deference on review.  *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).

Here, the RFC that Estep can perform "non-detailed three or four-step instructions," upon which the VE relied, did not conflict with the levels of reasoning development of the DOT.  *See Lindsley*, 560 F.3d at 604-605 (No actual conflict between the DOT and the VE's testimony, given that "the DOT's job classifications are collective descriptions of 'occupations' that can encompass numerous jobs.")  The DOT defines "reasoning development" as one of three "scale[s] of general education development," the others being mathematical and language development.  1991 WL 688702, DOT App. C. Components of the Definition Trailer.  It further defines Levels 1 and 2 of reasoning development as follows:

> LEVEL 1
>
> Apply commonsense understanding to carry out simple one- or two- step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> LEVEL 2
>
> Apply commonsense understanding to carry out detailed but uninvolved written or

18

>oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

DOT App. C, 1991 WL 688702. The use of different terminology, or the fact that the VE's job description did not "align perfectly with the DOT's listed occupation titles" is not evidence of a conflict. *See Lindsley*, 560 F.3d at 604-605.

Furthermore, the ALJ, complying with S.S.R. 00-4p, asked the VE if his answers were "consistent with the Dictionary of Occupational Titles." (Tr. 53.) The VE said yes. *Id*. Estep's counsel, trying to determine if the VE had identified simple, one or two step jobs, then cross-examined the VE, inquiring about the reasoning levels for each one. (Tr. 53-61.) After numerous questions to the VE, Estep's counsel apologized, having realized that she misheard the ALJ to say that Estep was **incapable** of performing three or four-step instructions, instead of "capable." (Tr. 61-62.) No further questions were asked. As Estep did not raise any conflicts at the time of the hearing, this argument is without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/ Greg White<br>
United States Magistrate Judge

Date:     January 23, 2012